WESTERN DIST. ARKANSAS
F I L E D

JUL 1 4 1997

CHRIS R. JOHNSON, CLERK
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

C.A. KUYKENDALL, TOM
BUCK JOHNS, ET AL.                                         PLAINTIFFS

          v.            Civil No. 89-2107

ARKLA, INC.; ARKANSAS LOUISIANA
GAS COMPANY, A DIVISION OF ARKLA,
INC.; ARKLA ENERGY RESOURCES, A DIVISION OF
ARKLA, INC.; ARKLA EXPLORATION COMPANY;
ARKOMA PRODUCTION COMPANY; AND
STEPHENS PRODUCTION COMPANY                                 DEFENDANTS

## MEMORANDUM OPINION

This case is currently before the court on the motion to enforce the settlement filed by Arkla Exploration Company and Arkoma Production Company, now known as Seagull Mid-South, Inc. (Seagull), and the motion to dismiss filed by NorAm Gas Transmission Company (NorAm). Seagull asks the court to enjoin NorAm from claiming in an action pending in Houston, Texas, that the gas from "new wells" is subject to the pricing provisions of a 1956 contract.

### Background.

To understand the parties' arguments, it is necessary to give a brief background of the original Kuykendall action. C.A. Kuykendall (Kuykendall), individually and on behalf of a class of lessors, initiated the action in Chancery Court, Franklin County, Arkansas, on April 4, 1989, against Arkla, Inc. (Arkla), Arkansas Louisiana Gas Company (ALGC), Arkla Energy Resources (AER), Arkla Exploration Company (AEC), and Arkoma Production Company (APC), and Stephens Production Company. The action was removed to this

court on May 8, 1989.

Kuykendall is the lessor of an oil and gas lease covering lands situated in the Ozark District of Franklin County, Arkansas. In 1956, defendants' predecessors in interest entered into a gas purchase contract (1956 gas purchase agreement between Athletic Mining and Smelting Co., et al., and ALGC referred to as GP3288) with ALGC covering properties in the Aetna Gas Field, including Kuykendall's lease. Under the terms of the contract, ALGC agreed to purchase the natural gas production for a term of twenty years and "so long thereafter as production can be delivered under the terms and conditions hereof." The contract set the maximum gas price at $0.1605 per MCF (thousand cubic feet).

The subject gas was to be sold and used exclusively in intrastate commerce. Subsequently, through various assignments and transactions, Stephens Production Company, AEC and Arkoma acquired the working interests, as lessees, in which the class, as lessors, had royalty interests.

On January 16, 1990, Kuykendall's motion for class certification was granted for a class defined as:

> All mineral lessors of defendants who are receiving royalty payments from the defendants from gas which is sold pursuant to the 1956 Gas Purchase Agreement between Athletic Mining & Smelting Company, et al., and the Arkansas Louisiana Gas Companies and which royalties are paid on the basis of approximately 16 cents MCF ("subject wells").

On April 24, 1990, a subclass defined as all mineral lessors of the defendants under leases containing a "fixed rate" royalty provision was created. There were three types of oil and gas

-2-

leases, market value leases, proceeds leases, and fixed rate leases, involved in the Kuykendall case.

The class sought additional royalties from the defendants contending that the gas production in question was sold at a price in excess of the sixteen cent price established by the 1956 Gas Purchase Agreement. Specifically, plaintiffs asserted the following causes of action: 1) in count one plaintiffs contended that the gas under the contract has been sold in interstate commerce and therefore had been erroneously classified as intrastate gas for purposes of the price control sections of the Natural Gas Policy Act; 2) in count two plaintiffs alleged the Arkla defendants had for many years, through the use of the Arkansas Fair Field Price Law, Ark. Code Ann.  23-15-104 (1987), received consideration for the subject gas substantially in excess of the sixteen cents stipulated in the contract; 3) in count three plaintiffs alleged the defendants circumvented the sixteen cent limitation by releasing portions of the gas production and blending it with higher price gas and then selling the blended gas on the spot market; and 4) in count four plaintiffs alleged the defendants had a duty and obligation to the lessors to obtain higher prices for the gas from the old wells and that this duty had been breached. Plaintiffs relied partially on the Natural Gas Well Head Decontrol Act of 1989 for the existence of this duty. Since the early 1970's royalties had been paid to class members on the $0.1605 price. Certain of these claims were dismissed by a memorandum opinion and order entered on February 26, 1991.

On December 31, 1982, Arkla, in a transaction with Arkoma, released the 1956 Athletic contract with the exception of the old wells, thus, enabling Arkoma to drill new wells on the Aetna leases. Arkla in a gas purchase contract agreed to pay Arkoma the highest price authorized for section 102 gas by the Natural Gas Policy Act. At that time, AEC and APC distributed the royalties from the old wells in the Aetna Field to the royalty owners.

After various proceedings, on May 29, 1991, a joint motion was filed seeking approval of a settlement agreement and release, approval of a form of class notice and approval of a form of election to rejoin the class. On June 3, 1991, an order was entered granting preliminary approval, allowing a clarification of the class definition, approving the form of the notice, and the form of the election to rejoin the class.

Class members were given notice of the proposed settlement, an opportunity to rejoin the class, and an opportunity to object. A settlement hearing was held on July 22, 1991.

At the conclusion of the hearing, the court approved the settlement agreement and release as well as class counsels' request for fees and expenses. An order was entered to that effect was entered on July 30, 1991. Paragraph 7 of the July 30th order dismissed the case with prejudice but the court retained jurisdiction "for the purpose of enforcing this Order and the Settlement Agreement."

The terms of the settlement agreement and release are set forth in a twelve page document. With respect to gas production

-4-

AO 72A
(Rev.8/82)

from "old wells" committed to GP3288, the agreement included the following:

> [c]ommencing with natural gas production for the month of July, 1991, and continuing through production for the month of September, 1994, AEC, Arkoma and Stephens . . . will pay or cause to be paid royalties to the Class as though the market value of the produced natural gas and the proceeds received by AEC, Arkoma and Stephens was $1.00 per MCF irrespective of the fact that the gas may continue to be sold pursuant to GP3288 at $0.1605 per MCF. Commencing with production for the month of October, 1994, the royalties described in the preceding sentence shall be paid or caused to be paid based on the then prevailing market price in the Aetna Field based on sales prices of production from gas wells drilled after December 31, 1982. The obligations of the two preceding sentences shall apply only to the working interests of AEC, Arkoma and Stephens and not to the working interests of other lessees in the listed gas production wells . . . .

*Kuykendall Settlement Agreement* ¶ 3. Paragraph ten of the Kuykendall Settlement Agreement provides that "[i]t is acknowledged by Arkla and Stephens that, with the exception of replacement wells, no additional new gas production wells will be drilled in the gas production units described in Exhibits A, B and C which are dedicated to the current pricing provisions of GP3288."

Seagull has now filed the instant motion to enforce the settlement. Seagull states that through a series of name changes and inter-corporate transfers, NorAm has succeeded to Arkla's interest under the 1956 contract. Seagull also informs the court that Arkla Exploration Company and Arkoma Production Company succeeded to certain working interests in the Aetna Field and that Seagull is the successor of their interests, if any, under the

-5-

1956 contract. Thus, Seagull and NorAm are successors-in-interest to the 1956 contract as seller and buyer, respectively.

On September 15, 1994, Seagull contends it terminated the 1956 contract. In 1995, Seagull states that it and NorAm mutually agreed to terminate the price upgrade contracts that Arkla had entered into with AEC and Arkoma. These price upgrade contracts contained provisions which superseded prior gas purchase contracts to the extent the production delivered under the upgrade contract would otherwise have been deliverable under a prior gas purchase contract.

In 1995, in Harris County, Texas, NorAm filed suit against Seagull challenging Seagull's termination of the 1956 contract.[1] That claim is not at issue here.

However, Seagull asserts that NorAm is now claiming in the Texas action that the gas from new wells is subject to the 1956 contract. NorAm is taking the position that when the parties mutually agreed in 1995 to terminate the upgrade contracts for gas from "new wells," all gas from the "new wells" became subject to the 1956 contract.

Seagull claims that NorAm's contention violates the Kuykendall settlement agreement and would fundamentally unravel the settlement because royalties for gas from all wells will be

_____

[1] The Texas action is apparently set for trial on July 28, 1997. The parties have also informed the court that a summary judgment motion has been pending since May 5, 1997, in the Texas action.

-6-

based on $0.1605[2] per MCF, not on prevailing market prices. Specifically, Seagull contends NorAm's claim that it is entitled to gas from "new wells" at $.1605 per MCF violates the agreement which provides that beginning October of 1994 royalties shall be paid based "on then prevailing market price in the Aetna Field based on sales prices of production from gas wells drilled after December 31, 1982." Seagull also contends NorAm's position violates paragraph ten of the agreement where Arkla acknowledged that "with the exception of replacement wells, no additional new gas production wells will be drilled in the gas production units described in Exhibits A, B and C which are dedicated to the current pricing provisions of GP3288." Seagull argues "additional new gas production wells" would be "new wells" not subject to the 1956 contract. If NorAm prevails on its argument, Seagull states this will clearly violate the provisions of the Kuykendall settlement and the clear intent of the parties thereunder that for all wells drilled after December 31, 1982--including wells drilled after the 1991 settlement--pricing would not be based on $0.1615 under the 1956 contract.

NorAm states the important issue in the Texas action is whether the 1983 contracts, particularly the prior contract provisions of the 1983 contracts, permanently nullified and erased the 1956 contract to the extent of overlapping dedications between

---

[2]   Seagull refers to the price as $0.1615.  However, the Kuykendall settlement agreement states the price as $0.1605.  The court will use the price set forth in the settlement agreement.

those contracts and the 1956 contract.  Its contention is that the 1983 contracts only suspended the operation of the 1956 contract during the period before their termination by mutual agreement in 1995.

NorAm points out that the Kuykendall case was a lessor-lessee dispute and that the Texas action is a dispute between a lessee and gas purchaser.  It points out that the two types of contracts are considered under the law to be separate and distinct and this separateness is not diminished or altered merely because the lessee, Seagull, is a party to both the oil and gas leases and to the gas purchase contract.  NorAm states the Kuykendall settlement establish higher royalties measured by prevailing market price-- not prices paid by the buyer to the seller under the 1956 contract.

It also notes that paragraph ten of the Kuykendall settlement agreement deals with the issue of whether "new gas production wells," that is post-settlement (post-1991) wells, will be drilled in certain specified areas and does not in any way deal with the question involved in the Texas litigation.  NorAm states this promise, if in fact a promise was made, was made on behalf of the lessees who are in the business of drilling wells.  NorAm points out it is not a lessee but a gas purchaser and owner of a gas pipeline.

With respect to the motion to enforce, NorAm contends:  (1) this court does not have jurisdiction over Seagull's motion because it does not seek enforcement of the order approving

-8-

settlement but instead asks the court to construe a separate contract; (2) this court should defer to the Texas action and abstain under the doctrine set forth in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S. Ct. 1236, 47 L.Ed.2d 483 (1976); (3) the Anti-Injunction Act prohibits the injunction requested because the contract construction issue involved in the Texas action has not been previously decided; (4) Seagull's motion is procedurally defective as NorAm was not and is not a party to the Kuykendall case or the settlement agreement and has not received the procedural rights accorded to one sought to be joined as a party such as service of summons, etc.; and (5) Seagull has failed to join Arkansas Western who has an interest in the contract question that Seagull seeks to bring before this court.

A response to the motion to enforce has been filed on behalf of the Kuykendall class. In the response the class states that the terms of the settlement agreement have been carried out and that it appears the class members are being paid in accordance with the terms of the agreement.

With respect to the motion to dismiss, the class takes no position except to state that NorAm's predecessors (Arkla, Inc., and Arkla Energy Resources, a Division of Arkla, Inc., and Arkansas Louisiana Gas Company, a Division of Arkla, Inc.) were parties to the original class action and the settlement agreement is binding upon NorAm.

-9-

## Discussion.

The court has ancillary jurisdiction to enforce the settlement agreement because the order of dismissal specifically retained jurisdiction over the settlement agreement. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 114 S. Ct. 1673, 128 L.Ed.2d 391 (1994). *See also Miener v. Missouri Dept. of Mental Health*, 62 F.3d 1126 (8th Cir. 1995). However, "[t]he jurisdiction of the District Court to enforce that agreement does not include the authority to resolve other disputes among the parties or to adjust their legal rights and responsibilities arising from other sources." *Knight v. Pulaski County Special School Dist.*, 112 F.3d 953, 955 (8th Cir. 1997). In such cases, an independent basis of jurisdiction must exist. *Id.*

Where a district court has retained jurisdiction, the All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Supreme Court has noted that the All Writs Act allows a federal court "to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Telephone Co.*, 434 U.S. 159, 172, 98 S. Ct. 364, 54 L.Ed.2d 376 (1977). The Act empowers a federal court to enjoin state proceedings that interfere, derogate, or conflict with federal judgments, orders, or settlements. *SEC v. G.C. George Securities, Inc.*, 637 F.2d 685,

-10-

687-88 (9th Cir. 1981).

The All Writs Act has been used to prevent litigants from frustrating or circumventing a court's orders. *See e.g., White v. National Football League*, 41 F.3d 402, 409 (8th Cir. 1994)(Act used to facilitate settlement of a class action by enjoining related suits of absent class members in other forum.), *cert. denied*, ___ U.S. ___, 115 S. Ct. 2569, 132 L.Ed.2d 821 (1995). Injunctions under this Act may be issued against non-parties and the Act requires no more than that the persons enjoined have the minimum contacts which are constitutionally required under due process. *United States v. International Brotherhood of Teamsters*, 907 F.2d 277, 281 (2d Cir. 1990). While in general a consent decree cannot be enforced against a non-party, it has been held that the "All Writs Act empowers a district court to enjoin actions by a nonparty when necessary to protect the court's jurisdiction over a consent decree." *United States v. International Brotherhood of Teamsters*, 911 F. Supp. 743, 750 (S.D.N.Y. 1996)(citations omitted).

We address first NorAm's argument that it was not a party to the Kuykendall suit or the settlement and is thus entitled to the procedural requirements such as service of a summons, etc., which apply to new parties. NorAm concedes that it did receive by transfer certain assets from Arkla, Inc. We also note that in the complaint filed in the Texas action, NorAm states that its initial predecessor in interest, Arkansas Louisiana Gas Company, became the buyer under the 1956 contract.

-11-

AO 72A
(Rev.8/82)

The settlement agreement specifically provides that it "shall be binding on the parties, their successors in interest and assigns." Thus, by NorAm's own admission it is a successor in interest of a party to the settlement agreement. As such, NorAm would be bound at least to the extent it acquired the interest of a party to the settlement agreement.

We need not further address NorAm's arguments about procedural deficiencies in service because we agree with NorAm's assessment of the situation and conclude Seagull is not entitled to the requested relief. While the court obviously has the power under its ancillary jurisdiction, the All Writs Act, and the relitigation exception to the Anti-Injunction Act to issue injunctions involving other litigation, as the Eighth Circuit stated in *Knight*, this power does not encompass the right "to resolve other disputes among the parties or to adjust their legal rights and responsibilities arising from other sources." *Knight*, 112 F.3d at 955.

In this case the Texas action involves questions regarding the ability of Seagull to terminate the 1956 contract, contract interpretation questions regarding the 1983 contract, and the effect of the termination of these contracts on the price NorAm is required to pay for gas it purchases from Seagull. The state court will not be required to interpret or enforce the settlement agreement approved by this court. As NorAm points out, the settlement agreement concerns the payment of royalties by the lessees to lessors. In contrast, the Texas action concerns the

-12-

purchase price of gas as between the buyer and seller as set forth in various contracts. The decision of the Texas court will not impact in anyway on the obligations of Seagull to pay royalties under the settlement agreement. The court concedes that if NorAm prevails on its claims Seagull may be in the undesirable position of paying royalties at market rate while only receiving from the buyer of the gas an amount considerably less than market rate. However, that situation was not addressed in the settlement agreement.

Using layman's language to explain the court's reasoning, a distributor of tomatoes could agree to pay a tomato farmer 50¢ per pound for all tomatoes grown in the farmer's tomato patch, and agree to sell them to a third-party for 25¢ per pound. It would not be inconsistent for a court to enforce the contract between the farmer and the distributer and another court to construe and enforce the other contract between the distributor and the buyer of the tomatoes. It obviously wouldn't be a "good deal" for the distributor, but that is no reason for the court to interfere.

**Conclusion.**

For the reasons stated, the motion to enforce the settlement agreement is denied. NorAm's request that the court deny any relief to Seagull will be granted. A separate order in accordance herewith will be concurrently entered.

Dated: July 11, 1997

United States District Judge

-13-

AO 72A
(Rev.8/82)